MEYER WILSON CO., LPA
Matthew R. Wilson (SBN 290473)
mwilson@meyerwilson.com
Michael J. Boyle, Jr. (SBN 258560)
mboyle@meyerwilson.com
Jared W. Connors (*pro hac vice* to be filed)
jconnors@meyerwilson.com
305 W. Nationwide Blvd.
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

TURKE & STRAUSS LLP
Samuel J. Strauss (*pro hac vice* to be filed)
sam@turkestrauss.com
Raina Borrelli (*pro hac vice* to be filed)
raina@turkestrauss.com
613 Williamson St., #201
Madison, WI 53703
P: (608) 237-1775

*Attorneys for Plaintiffs and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN CALIFORNIA FERTILITY MEDICAL CENTER<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL ENCLOSED** |

### INTRODUCTION

1. This case is *not* about an ordinary data breach. Defendant Northern California Fertility Medical Center (the "Fertility Center") collects and stores some of the most highly sensitive and private information about its patients. As a result of the Fertility Center's negligence, hackers broke into its servers and obtained thousands of persons' intimate family planning information—including whether they have "cryopreserved tissue" (frozen semen, eggs, or embryos) stored at the Fertility Clinic. Though all protected health information (PHI) is sensitive by nature, the PHI in this case is of a type that virtually everyone would wish to keep private, typically choosing to reveal it only to the closest of friends or family members.

2. Plaintiff Jane Doe is a former patient of the Fertility Center. Concerned about the privacy of her information, she specifically instructed the Fertility Center to delete her data and cease all contact around 2020. It evidently didn't bother to do so, because she received a notice that

1
**Class Action Complaint**

her PHI was exposed in the data breach. She brings this action individually and on behalf of all others similarly situated, seeking damages and equitable relief.

**PARTIES**

3. Plaintiff Jane Doe resides in Colorado Springs, Colorado, where she intends to remain.

4. Doe brings this action under a pseudonym "to preserve [her] privacy in a matter of sensitive and highly personal nature." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000) (quotation omitted). The fertility treatment Doe received from Defendant are deeply personal to her, and she reasonably wishes to preserve what remains of her privacy. Doe's privacy interests far outweigh the prejudice (if any) to Defendant or the public.

5. Defendant Northern California Fertility Medical Center is a professional corporation incorporated under California law. Its principal place of business is located at 4320 Auburn Blvd, Sacramento, CA 95841.

**JURISDICTION & VENUE**

6. This Court has personal jurisdiction over the Fertility Clinic because its principal place of business is located in California.

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member of the proposed Class (including Doe) is a citizen of a state different from that of the Fertility Clinic; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 class members, and none of the exceptions under the subsection apply to this action.

8. Venue is proper in the Eastern District of California because the Fertility Clinic's principal place of business is located in Sacramento. On information and belief, the Fertility Center made (or failed to make) its decisions regarding data security practices from its California headquarters.

**FACTUAL ALLEGATIONS**

**A.  The Fertility Clinic collects and stores highly sensitive PHI about its patients.**

9. The Fertility Clinic was established in 1993. It offers a full range of infertility services, including laparoscopic laser surgery, microsurgery (reversal of tubal ligation or

vasectomy), ovulation induction, artificial insemination (IUI), in vitro fertilization (IVF), and IVF with egg donation and egg freezing.

10. The Fertility Clinic has a thriving practice and ample financial resources. It is the largest IVF provider in the Central Valley region. Indeed, it recently built its own stand-alone building in Sacramento—a state-of-the art, 12,500 square feet facility that houses an IVF laboratory, a certified Ambulatory Surgery Center, and andrology and endocrinology laboratories.

11. As a healthcare provider, the Fertility Clinic creates, maintains, preserves, and stores PHI regarding its patients' fertility treatments.

12. The content of the PHI that the Fertility Clinic creates and maintains is highly sensitive.

13. Given the type of data that the Fertility Clinic collected and stored, it was highly foreseeable that bad actors would attempt to access the Fertility Clinic's systems and servers.

14. "[H]ackers are likely to be drawn to databases containing information which has a high value on secondary black markets," such as "intimate and health-related data." Mark Verstraete & Tal Zarsky, *Optimizing Breach Notification*, 2021 U. ILL. L. REV. 803, 854–55 (2021). Consequently, "relevant and rational firms should engage in greater security investment and reduced collection— all steps to limit the prospects of a potential breach and subsequent notification." *Id.* at 855.

15. Companies in the healthcare industry frequently create and store identifying, financial, and health-related data.

16. Unsurprisingly, then, "the healthcare industry has faced the highest number of [data] breaches among all industries." Adil Hussain Seh, et al., *Healthcare Data Breaches: Insights and Implications*, 8 HEALTHCARE 133, 2 (2020), https://bit.ly/3QcL4Ng.

17. Data breaches are a well-known threat in the healthcare industry. According to the American Medical Association, "cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care." Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://bit.ly/3mKAf7O.

18. The Fertility Clinic stored PHI on its servers.

3
**Class Action Complaint**

19. Therefore, it was highly foreseeable that a bad actor would seek to access the Fertility Clinic's servers without authorization.

**B.  As a result of the Fertility Clinic's negligence, hackers accessed Class Members' PHI.**

20. Earlier this year, cybercriminals gained access to the Fertility Clinic's servers.

21. Cybercriminals were able to view patients' PHI, including their names, whether they have received an ultrasound from the Fertility Clinic, and whether they have "cryopreserved tissue" stored at the Fertility Clinic. Of course, if one's name is even associated with the Fertility Clinic at all, that is tantamount to the revelation of this most intimate of health and family planning information, given the nature of the Fertility Clinic's services.

22. The Fertility Clinic claims to have discovered the data breach on July 24, 2022.

23. However, the Fertility Clinic did not notify victims of the data breach until Sept. 28, 2022—a delay of 73 days.

24. A delay of 73 days was unreasonable under the circumstances.

25. On information and belief, the Fertility Clinic failed to adequately train its employees on basic cybersecurity protocols, including:

    a. Effective password management and encryption protocols, including, but not limited to, the use of multi-factor authentication for all users;

    b. Locking, encrypting and limiting access to computers and files containing sensitive information;

    c. Implementing guidelines for maintaining and communicating sensitive data;

    d. Protecting sensitive patient information, including personal and financial information, by implementing protocols on how to request and respond to requests for the transfer of such information and how to securely send such information through a secure file transfer system to only known recipients; and

    e. Providing focused cybersecurity awareness training programs for employees.

26. The FTC has noted the need to factor data security into all business decision-making.

*Start With Security, A Guide for Business,* FTC (accessed June 9, 2022), https://bit.ly/3mHCGYz. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software. *Id.*

27.  On information and belief, the Fertility Clinic's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PHI of Plaintiff and thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

28.  The Fertility Clinic violated its obligation to implement best practices and comply with industry standards concerning computer system security. The Fertility Clinic failed to comply with security standards and allowed its patients' PHI to be accessed and stolen by failing to implement security measures that could have prevented or mitigated the data

**C.     Plaintiff and the Class suffered concrete injuries.**

29.  Plaintiff Jane Doe is a former patient of the Fertility Clinic. The Fertility Clinic collected and stored her PHI in connection with a patient-physician relationship. Around October 3, 2022, Doe received a notice that her PHI had been exposed in the data breach.

30.  Doe was outraged that the Fertility Clinic allowed her PHI to be stolen. And to make matters worse, Doe had **specifically instructed the Fertility Clinic to remove her data from its system**. None of this would have occurred (for Doe, anyway) if the Fertility Clinic had simply honored her request in the first place.

31.  As a result of the Fertility Clinic's misconduct, Doe and the Class suffered a concrete privacy injury.

32.  When PHI is exposed in a data breach, an injury *has already occurred* because the

victim inherently suffered a privacy injury.

33. Privacy injuries are concrete. As Justice Brandeis once observed, an invasion of privacy can subject victims "to mental pain and distress, far greater than could be inflicted by mere bodily injury." Louis D. Brandeis & Samuel D. Warren, *The Right to Privacy*, 4 HARV. L. REV. 193, 196 (1890).

34. Medical data breaches cause privacy injuries because they expose inherently private information to the public without consent. "Patients are highly sensitive to disclosure of their health information," particularly because PHI "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, then, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of American patients express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH. L.J. 1523, 1557 (2009).

35. The PHI exposed in this case involved treatment for fertility treatment, which is a particularly sensitive type of information. For example, certain fertility treatments are controversial under many religious traditions, so the "patient's standing in the religious community" could be compromised if it were discovered that they received treatment from the Fertility Center. Leslie Ayensu-Coker, et. al, *Ethical Quandaries in Gamete-Embryo Cryopreservation Related to Oncofertility*, 41 J.L. MED. & ETHICS 711, 713 (2013).

36. Doe—like any reasonable person similarly situated—experienced extreme distress and anxiety upon learning that her privacy had been invaded in this manner.

37. Doe was also required to spend several hours investigating the data breach, a task she expects will continue to take up her time in the future.

38. None of the injuries would have occurred but-for the Fertility Clinic's misconduct.

39. Moreover, the Fertility Clinic still has possession of Plaintiff and the Class's PHI. On information and belief, Defendant still has not implemented reasonable data security safeguards. Therefore, there is a substantial risk that another data breach will occur and Plaintiff and the Class will suffer yet another privacy injury.

## CLASS ACTION ALLEGATIONS

40. Under FED. R. CIV. P. 23(b)(2) and (b)(3), Plaintiff seeks certification of a class defined as follows:

> Any person whose PHI was exposed to a third-party in the breach of Northern California Fertility Medical Center's server(s) that occurred around July 24, 2022,

41. Excluded from the Class are Defendant's employees, officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

42. *Ascertainability.* The Fertility Clinic has already identified and sent notice to victims of the data breach. Class members will be identified in a substantially similar manner.

43. *Numerosity.* The Fertility Clinic reported to the Department of Health and Human Services that 12,145 individuals were affected by the data breach—far too many to join in a single action. Thus, the proposed Class is so numerous that individual joinder would be impracticable would be impracticable.

44. *Commonality and Predominance.* This case presents questions of law and fact common to all class members, which predominate over individualized issues. Those common questions include:

   a. Whether Defendant is a "provider of health care" under CAL. CIV. CODE § 56.101(a).
   b. Whether the information exposed in the breach was "medical information" under CAL. CIV. CODE § 56.101(a).
   c. Whether Defendant owed a duty to exercise reasonable care in maintaining medical information;
   d. Whether Defendant exercised reasonable care with respect to its maintenance of medical information;
   e. Whether Defendant exercised reasonable care with respect to the data breach

notification it sent to the Class;

f.  Whether Defendant's negligence caused a legally cognizable injury to the Class;

g.  Whether Defendant complied with the statutory and regulatory requirements for sending data breach notifications;

h.  Whether the Class is entitled to nominal damages under the Confidentiality of Medical Information Act;

i.  Whether Defendant caused a highly offensive breach of social norms;

j.  Whether the Class has a reasonable expectation of privacy in their PHI; and

k.  Whether the Class is entitled to injunctive relief or restitution under the Unfair Competition Law.

45. *Typicality.* Like all class members, Plaintiff's claims arise from the exposure of her PHI in the July 24, 2022 data breach. Consequently, Plaintiffs' claims are typical of the class they seek to represent.

46. *Adequacy of Class Representative.* Plaintiff is an adequate class representative. She seeks relief for all members of the class and will put the interests of the class as a whole ahead of her individual interests. She has no conflicts of interest with any other member of the class.

47. *Adequacy of Class Counsel.* Plaintiff has retained experienced counsel who have successfully prosecuted class actions, including data breach class actions, in California courts, as well as in state and federal courts throughout the country.

48. *Superiority and Manageability.* Class-wide adjudication will produce substantial benefits for the Court and for litigants because joinder of all individual Class members is impracticable and inefficient, particularly when compared to the relatively small amount-in-controversy for most individual Class members. Moreover, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications. As a result, class-wide adjudication presents fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

49. *Injunctive or Declaratory Relief.* Defendant's acts or omissions giving rise to the data breach are common to the class. Injunctive relief or declaratory relief that is proper for Plaintiff will

be appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### Count 1: Negligence

### (On Behalf of Plaintiff and the Class)

50. Plaintiff incorporates by reference all of the above allegations.

51. Defendant owed a duty to reasonably safeguard data that Plaintiff and the Class entrusted to it in the scope of their patient-physician relationship.

52. It was highly foreseeable that a failure to reasonably safeguard Plaintiff and the Class's PII would lead to a data breach. Plaintiff and the Class are members of a well-defined, foreseeable, and probable group of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiff and the Class's personal and financial information in the conduct of its business, and Defendant retained that information.

53. As set forth above, Defendant breached its duty of reasonable care on many levels, including but not limited to, its failure:

   a. To implement industry-standard security procedures sufficient to reasonably protect the information from the data breach;

   b. To implement industry-standard security procedures for detecting and responding to an actual or attempted data breach;

   c. To reasonably train its employees on data security procedures; and

   d. To reasonably supervise its agents, contractors, vendors, and suppliers who were charged with handling and securing the PII of Plaintiff and the Class.

54. Defendant's breach of its duty of care was willful or reckless. Defendant was well aware of the cybersecurity risks that result from unreasonable data security practices, yet it consciously disregarded those risks without adequate justification.

55. Defendant's recklessness or negligence directly and foreseeably caused Plaintiff and the Class's injuries, including, without limitation, theft of their PII by criminals, improper disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the

effects of the data breach. But-for North Highland's negligence, those injuries would not have occurred.

56. Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

**Count 2: Invasion of Privacy**

**(On Behalf of Plaintiff and the Class)**

57. Plaintiff incorporates by reference all preceding allegations.

58. Under California law, defendants are liable for invasion of privacy if: (1) the plaintiff possessed a legally protected privacy interest, (2) in which the plaintiff maintained a reasonable expectation of privacy, and (3) the defendant's intrusion into that privacy interest was highly offensive. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 601–02 (9th Cir. 2020).

59. Defendant knew, or should have known, that its data security practices were inadequate and had numerous vulnerabilities.

60. Defendant recklessly or negligently failed to take reasonable precautions to ensure its data systems were protected.

61. Defendant knew or should have known that its acts and omissions would likely result in a data breach, which would necessarily cause harm to Plaintiffs and the Class.

62. The exposure of medical information is a highly offensive breach of social norms.

63. Plaintiff and the Class had a reasonable, legally protected privacy interest in their medical information.

64. As a result of Defendant's acts and omissions, third parties accessed the medical records and other personal information of Plaintiff and the Class without authorization.

65. Defendant is liable to Plaintiffs and the Class for damages in an amount to be determined at trial.

**Count 3: Violations of the Confidentiality of Medical Information Act**

**CAL. CIV. CODE § 56, *et seq.***

**(On Behalf of Plaintiff and the Class)**

66. Plaintiff incorporates by reference all preceding allegations.

67. Under Section 56.101, "[a]ny provider of health care . . . who negligently creates,

maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." (CAL. CIV. CODE § 56.101(a). Section 56.36(b) provides that "an individual may bring an action against a person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both" actual damages and nominal damages of $1,000. *Id.* § 56.36(b).

68. A claim for "negligent release under section 56.36 does not require an affirmative communicative act but instead can be accomplished by negligently allowing information to end up in the possession of an unauthorized person." *Sutter Health v. Superior Court*, 227 Cal. App. 4th 1546, 1554–55 (2014). Defendants are liable if their "negligence results in unauthorized or wrongful access to the [plaintiff's] information." *Regents of Univ. of Cal. v. Superior Court*, 220 Cal. App. 4th 549, 554 (2013).

69. Defendant is a provider of health care.

70. Defendant created, maintained, preserved, stored, abandoned, destroyed, and disposed of medical information regarding Plaintiff and the Class.

71. Defendant was negligent because it failed to take reasonable precautions to ensure its data systems were protected.

72. As a result of Defendant's negligence, an unauthorized third-party was able to access and view the medical information of Plaintiff and the Class.

73. Defendant is therefore liable for damages in an amount to be determined at trial, but not less than the statutorily provided nominal damages of $1,000 for each class member.

### Count 4: Violations of the Unfair Competition Law
### CAL. BUS. & PROF. CODE § 17200, *et seq.*
### (On Behalf of Plaintiff and the Class)

74. Plaintiff incorporates by reference all preceding allegations.

75. Defendant engaged in unlawful and unfair business practices in violation of CAL. BUS. & PROF. CODE § 17200, *et seq.*.

76. Defendant's conduct is unlawful because it violates the Confidentiality of Medical

Information Act.

77. Plaintiff and the Class paid money to Defendant in exchange for fertility treatment.

78. In order to receive medical treatment, Plaintiff and the Class were required to provide their personal information to Defendant and allow Defendant to create and store highly sensitive PHI.

79. Plaintiff and the Class reasonably believed that Defendant would implement reasonable safeguards to keep their PHI secure.

80. In light of the sensitive and confidential nature of their PHI, Defendant's data security practices were highly material to Plaintiff and the Class. They would not have contracted with Defendant—let alone paid the full market price for Defendant's services—if they had known that Defendant would fail to implement reasonable data security measures consistent with its statutory duty.

81. "Such materiality is to be expected in light of the sensitive and confidential nature of the information" at issue in this case. *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 528–29 (2022). "Few prospective patients would entrust such information—and pay full market prices—to a medical provider known to be careless with it. Indeed, the Legislature has acted to protect patients' expectations that their information will be kept confidential and secure." *Id.* (citing CAL. CIV. CODE § 56.101(a)–(b)).

82. Therefore, Plaintiff and the Class were denied the benefit of their bargain with Defendant.

83. Plaintiff and the Class are entitled to equitable and injunctive relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities, including, for example, an order requiring Defendant to honor all requests to destroy a patients' PHI; and any other equitable relief the Court deems proper.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all others similarly situated, demands:

a. certification of the proposed Class;

b. appointment of the Plaintiff's counsel as class counsel;

c. actual and punitive damages in an amount to be determined at trial;

d. a declaration that Defendant's conduct wrongful, unfair, unconscionable and in violation of California law;

e. an order enjoining Defendant's unlawful and unfair conduct;

f. restitution and disgorgement of all profits Defendant wrongfully obtained;

g. an award to Plaintiff and the Class of all damages, including attorneys' fees and reimbursement of litigation expenses, recoverable under applicable law; and

h. such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all applicable claims.

Respectfully submitted,

/s/ Michael J. Boyle

MEYER WILSON CO., LPA
Matthew R. Wilson (SBN 290473)
mwilson@meyerwilson.com
Michael J. Boyle, Jr. (SBN 258560)
mboyle@meyerwilson.com
Jared W. Connors (*pro hac vice* to be filed)
jconnors@meyerwilson.com
305 W. Nationwide Blvd
Columbus, OH 43215
PH: 614-224-6000
Fax: 614-224-6066

TURKE & STRAUSS LLP
Samuel J. Strauss (*pro hac vice* to be filed)
sam@turkestrauss.com
Raina Borrelli (*pro hac vice* to be filed)
raina@turkestrauss.com
613 Williamson St., #201
Madison, WI 53703
P: (608) 237-1775

**Class Action Complaint**